UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| OWNERS INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | ) Case No. 2:09CV00016 AGF |
| | ) |
| AMCO INSURANCE COMPANY, | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |

## MEMORANDUM AND ORDER

This diversity matter is before the Court on the parties' cross-motions for summary judgment. Both parties are liability insurance providers. They each seek a declaratory judgment regarding their obligations regarding a motor vehicle accident that led to the filing and settlement of a wrongful death suit based on the negligence of the driver of a certain vehicle. The parties dispute who owned this vehicle at the time of the accident, and thus, which insurance company was liable for the settlement amount. For the reasons set forth below, the motion for summary judgment of Plaintiff/Counterclaim Defendant Owners Insurance Company ("Owners"), and the motion for summary judgment of Defendant/Counterclaim Plaintiff AMCO Insurance Company ("AMCO") shall both be denied.

## BACKGROUND

Owners was the liability insurance provider to Coleman & Jansen Enterprise, Inc. d/b/a Neal Coleman Auto Sales ("Coleman"). The Coleman dealership was located in Quincy, Illinois, and owned by John Harvey. Owners issued a Garage Liability Policy with Coleman as the named insured and with effective coverage dates of December 31, 2006, through December 31, 2007. Under the policy, Owners agreed to pay all amounts that the insured, or anyone using a covered vehicle with permission of the insured, became obligated to pay as legal damages because of bodily injury or death resulting therefrom. Vehicles covered by the policy included all those owned by the insured, excluding those transferred to another pursuant to an agreement of sale. (Doc. #24-10.)

AMCO was the liability insurance provider to James L. Jacobs d/b/a Jim's Auto Sales ("Mr. Jacobs"). Mr. Jacobs' auto dealership was located in Bloomfield, Iowa. AMCO issued a Garage Liability Policy to Mr. Jacobs with effective coverage dates of April 15, 2007, through April 15, 2008. This policy provided that AMCO would pay all amounts that the insured, or anyone using a covered vehicle with permission of the insured, became obligated to pay as legal damages because of bodily injury or death caused by an accident resulting from garage operations. Vehicles covered by the policy included all those owned by the insured, including those acquired after the policy began, subject to some exclusions not relevant here. (Doc. #7-5.)

The record establishes that in August 2007, self-employed "auto broker/car buyer" Janet Hassen[1] heard that Coleman was going out of business and liquidating its inventory of vehicles. Ms. Hassen acquired a list of Coleman's inventory and testified that she faxed it to Mr. Jacobs. Mr. Jacobs indicated an interest in purchasing two minivans: a 2003 Chrysler Town & Country, and a 2005 Dodge Grand Caravan.[2] (Hassen Dep., Doc. #24-17 at 12, 17-29, 53.)

Ms. Hassen testified that she had been acquainted with Mr. Jacobs for five or six years prior to the transaction at issue, and had "brokered" the sales of six to twelve vehicles to him, at least one of which she also delivered. Ms. Hassen testified that in her past dealings with Mr. Jacobs, she would pick up the vehicle and its title and deliver both to Mr. Jacobs. He would then accept the vehicle, sign the title, pay Ms. Hassen a "broker's fee" of $100 per vehicle, reimburse her for expenses incurred during delivery (such as fuel), and give her a check for the purchase price. If Ms. Hassen had to bring another driver with her, Mr. Jacobs paid that driver as well. Ms. Hassen then delivered the check for the purchase price to the seller.[3] Ms. Hassen testified that this was how she

---

[1] Ms. Hassen is referred to in some documents as "Janet Gower" or "Janet Grower."

[2] In her deposition, Ms. Hassen refers to this vehicle as a "Dodge STX."

[3] Though parts of Ms. Hassen's testimony imply that she made multiple deliveries to Mr. Jacobs, (Mr. Jacobs "would usually pay me $100 cash" for delivering the vehicles; Mr. Jacobs "would pay the driver, if I had to bring another driver with me." (Hassen Dep. at 32)), she later testified that she delivered only one vehicle to him in the past. Id. at 107.

planned to carry out the purchase and delivery of the Town & Country and Grand Caravan.  Id. at 29-35, 41, 106-07, 114-15.

Mr. Jacobs testified that prior to September 2007, he had purchased one vehicle "through" Ms. Hassen, then later testified "it was only three, but I could be wrong."  Mr. Jacobs was adamant that he never compensated individuals for purchasing or delivering vehicles for him, nor did he authorize anyone to negotiate on his behalf.  Instead, he informed those who purchased vehicles for him of the price that he was willing to pay.  When a vehicle was delivered to his lot, he paid the agreed upon price and signed the title and bill of sale, so long as the vehicle was "right," meaning, that it was as represented.  If a vehicle was not "right," he would not pay for it.  Mr. Jacobs testified that he could not recall any time that he rejected a vehicle for any reason other than it not being what was represented to him.  (Jacobs Dep., Doc. #22-5 at 6-13, 18, 21-22.)

Mr. Jacobs testified that on the occasion in question, he spoke to Ms. Hassen by telephone and told her the price he would be willing to pay for the vans.  Though he could not recall if Ms. Hassen called him to tell him that his price was accepted, he stated that it was "very possible," because otherwise "she wouldn't have been bringing [the vans] to me."  Mr. Jacobs testified that no additional negotiating needed to take place, and that "[w]hatever price we settled on, that is the price I would have give [sic] if [the vans] were right."  He further testified that it was his intent to buy the vans "[i]f they had got to my place, yes, and if they had suited me."  Id. at 27-28, 36.

4

According to Ms. Hassen, Mr. Jacobs authorized her to negotiate the purchase of the two vans on his behalf. Ms. Hassen first testified that "I don't remember if I found out the price [from Mr. Harvey] or if [Mr. Jacobs] just made an offer and if I gave the offer to [Mr. Harvey]," and later that Mr. Jacobs "made the bid. I told the bid to Mr. Harvey. He accepted it. At that point, as far as everybody was concerned, it was a done deal." (Hassen Dep. at 29, 33.) Ms. Hassen did not recall the exact date on which this agreement was reached, but on September 27, 2007, she went to Coleman to pick up the two vans. She was given the Town & Country's title, bill of sale, odometer statement, tax form, and warranty sticker. (Hassen Dep. at 42, 64-68.) The title, bill of sale, odometer statement, and tax form each named "Neal Coleman Auto Sales" as the seller/transferor and "Jim's Auto Sales" as the buyer/transferee. Both the bill of sale and tax form indicated a purchase price of $11,000. Each document was signed by Coleman's title clerk and dated September 25, 2007. (Docs. #22-2, 24-6.) Ms. Hassen testified that she received similar paperwork for the Grand Caravan. (Hassen Dep. at 67.) Mr. Harvey testified that he "considered [the Town & Country] sold" at this time. (Harvey Dep., Doc. #24-7 at 38.)

Ms. Hassen testified that she then spoke to Mr. Jacobs by telephone and he requested that the vans be delivered to him as soon as possible. Ms. Hassen informed Mr. Jacobs that it was too late for her to make the trip that day and that she would deliver the vans the next day. Ms. Hassen and another driver took possession of the two vans and drove them to West Quincy, Missouri. There they were stored overnight at West

5

Quincy Auto Auction, a property owned by Lackey Auto, Inc. ("Lackey Auto"). Lackey Auto was owned by Ms. Hassen's boyfriend at the time, Virgil Lackey. (Hassen Dep. at 39-42, 50, 114.)

Both Ms. Hassen and Mr. Harvey testified that Coleman's dealer plates were removed from the two vans before they were driven off Coleman's lot. Neither Ms. Hassen nor Mr. Harvey recalled what license plates, if any, were put on the vans. Ms. Hassen did not have her own automobile insurance or liability policy at that time, and Mr. Harvey did not require proof of insurance from Ms. Hassen before giving her possession of the vans because it was not his policy to request proof of insurance from wholesale purchasers. (Harvey Dep. at 36, 49; Hassen Dep. at 43, 45.)

On the morning of September 28, 2007, Ms. Hassen put dealer plates belonging to Lackey Auto onto the two vans. She testified that she had "borrowed" Lackey Auto's plates before, and for that reason she did not ask Mr. Lackey for permission to do so on this occasion. (Hassen Dep. at 77-78.) At around 8:30 a.m., Ms. Hassen left West Quincy driving the Town & Country to deliver it to Mr. Jacobs in Iowa, with another driver accompanying her in the Grand Caravan. While heading north on a Missouri highway, Ms. Hassen struck the rear of a car driven by Floyd Bowles, who died as a result of the accident. Id. at 52-56.

After the accident, Ms. Hassen informed Mr. Jacobs of what had transpired. According to Ms. Hassen, Mr. Jacobs told her that he was still interested in the Grand Caravan and asked for it to be delivered to him that day, but for reasons unclear from the

6

record, delivery never occurred. Both the Town & Country and the Grand Caravan were taken back to West Quincy and stored at Mr. Lackey's property. (Hassen Dep. at 75, 89, 104; Harvey Dep. at 45.)

According to Mr. Harvey, after five or six months of not receiving payment from Mr. Jacobs for the Grand Caravan, Mr. Lackey obtained an affidavit from Mr. Jacobs releasing ownership of the van. (Harvey Dep. at 45.) However, Mr. Jacobs claimed that no one contacted him about signing anything to facilitate the sale of either van, and that he never spoke to Mr. Lackey after the accident. At some point, the Grand Caravan was sold at Quincy Auto Auction. Mr. Jacobs was present at the auction when the sale took place. The Grand Caravan had "Jim's Auto" in the window where the seller's name is typically displayed. (Jacobs Dep. at 44.) However, proceeds from the sale of the van went to a bank to satisfy a debt owed by Coleman. (Harvey Dep. at 46.)

According to Mr. Jacobs, at some point after the accident he was asked by someone whose identity he could not recall to sign the Town & Country's title.[4] However, he refused to do so because someone had advised him that if he did, he would get "hung," and he did not want to buy a van that was "all tore to heck." Mr. Jacobs testified that he did not recall anyone asking him to pay for either van. (Jacobs Dep. at 34, 40-41, 53.)

---

[4] At another point in his deposition, Mr. Jacobs claimed that "[n]obody contacted me about signing the titles because I didn't sign no titles." (Jacobs Dep. at 43.)

7

Mr. Harvey testified that after a "long period of time" without receiving payment from Mr. Jacobs, he submitted a claim to Owners for the collision damage to the Town & Country. (Harvey Dep. at 40-42.) On November 6, 2007, Owners denied this claim on the basis that the vehicle bore Lackey Auto's dealer plates at the time of the accident. (Doc. #22-4.) As of January 15, 2009, the Town & Country was located in Ms. Hassen's backyard and was not in driveable condition. (Hassen Dep. at 100.)

On July 18, 2008, Jerald Bowles, decedent's brother, filed a petition in the Circuit Court for Lewis County, Missouri, against Ms. Hassen, Mr. Jacobs, Coleman, and Lackey Auto for the wrongful death of Floyd Bowles (the "Bowles suit"). The Bowles suit alleged that Ms. Hassen's negligence caused the accident that led to the death of Floyd Bowles, and that the other named defendants were liable under a respondeat superior theory as employers or principals of Ms. Hassen at the time of the accident. (Doc. #24-8.)

Mr. Jacobs, Coleman, and Lackey Auto filed separate motions for summary judgment on the ground that Ms. Hassen was not their respective employee or agent at the time of the accident. Ms. Hassen hired her own attorney and demanded that Owners and AMCO defend and indemnify her in the Bowles suit. Jerald Bowles made a settlement demand of $500,000 on Ms. Hassen, Owners, and AMCO. Ms. Hassen's attorney forwarded this demand to Owners and AMCO, again demanding defense and indemnification, and threatening to enter into an agreement under Mo. Rev. Stat.

8

§537.065[5] if the demand were not met. (Doc. #24-18.) Owners and AMCO negotiated a settlement in the amount of $250,000, with each insurer paying half, for all claims against Ms. Hassen, Mr. Jacobs, and Coleman. The settlement dismissed the claims against Mr. Jacobs and Coleman before their motions for summary judgment were decided. Owners and AMCO each reserved the right to litigate the coverage issue as to Ms. Hassen and recover its half of the settlement payment. (Docs. #1, 7.)

On April 20, 2009, Owners filed this action for declaratory judgment and equitable contribution against AMCO, alleging that Coleman was not the owner of the Town & Country at the time of the accident, and thus Owners owed no duty to defend and indemnify Ms. Hassen. On June 15, 2009, AMCO filed an answer and counterclaim seeking a declaration that Owners was obligated to cover Ms. Hassen at the time of the accident. Each party seeks reimbursement of the $125,000 it contributed to the Bowles settlement.

## DISCUSSION

The resolution of this case turns ultimately on the question of whether Coleman or Mr. Jacobs owned the Town & Country at the time of the accident. If Mr. Jacobs owned the vehicle, AMCO's liability policy would cover the vehicle unless an exception to

---

[5] The statute provides in relevant part: "Any person having an unliquidated claim for damages against a tort-feasor . . . may enter into a contract with such tort-feasor . . . whereby . . . the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person . . . will levy execution, by garnishment or as otherwise provided by law, except against . . . any insurer which insures the legal liability of the tort-feasor for such damage . . ."

9

coverage applied. On the other hand, if Coleman owned the vehicle, Owners' liability policy would cover the vehicle barring an applicable exception. As the parties argue, the Court first must decide which state's law is to be applied to determine ownership.

The three states with a relationship to the dispute are Illinois, Iowa, and Missouri. Missouri is a "strict title state," meaning that "'assignment of the certificate of title in the manner provided by statute is the exclusive and only method of transferring title to a motor vehicle.' . . . '[T]here are no exceptions to conform to intentions.'" Bolt v. Giordano, 310 S.W.3d 237, 244 (Mo. Ct. App. 2010) (citations omitted) (quoting Jackson v. Cannon, 147 S.W.3d 168, 172 (Mo. App. Ct. 2004); Shivers v. Carr, 219 S.W.3d 301, 304 (Mo. Ct. App. 2007)). If Missouri law is applied, Coleman owned the Town & Country at the time of the accident because it is undisputed that title was not formally transferred to Mr. Jacobs.

Iowa uses a strict title standard in most situations, see Iowa Code § 321.45, but excuses the title holder from civil liability arising from "negligent operation of the motor vehicle by another" if he "has made a bona fide sale or transfer" and "delivered possession of the motor vehicle to the purchaser or transferee." Iowa Code § 321.493(3); see also W. States Ins. Co. v. Continental Ins. Co., 602 N.W.2d 360, 362 (Iowa 1999) ("[I]f an owner of a car sells and delivers it to a buyer, the buyer has a collision with a third person before the title certificate is transferred, and the third person sues the seller, the seller has a defense in that he is not in fact the owner.").

Under Illinois law, transfer of title "is not necessarily determinative of the passage of ownership. It is the intent of the parties involved, and not such statutory prerequisites which determines ownership.'" Libertyville Toyota v. U.S. Bank, 864 N.E.2d 850, 854 (Ill. App. Ct. 2007) (quoting Dan Pilson Auto Ctr. v. DeMarco, 509 N.E.2d 159, 161 (Ill. App. Ct. 1987)). Thus, if Iowa or Illinois law is applied, it would have to be determined whether there was a "bona fide sale" and delivery of possession, or whether the "intent of the parties" demonstrates that ownership passed to Jacobs.

In support of its motion for summary judgment, Owners argues that Illinois law governs all issues relating to ownership and coverage of the Town & Country, and that under Illinois law, Jacobs owned the vehicle at the time of the collision. Owners argues that the "most significant relationship" test set forth in the Restatement (Second) of Conflicts of Law § 188 should be applied to the choice of law question, and that the agreement for sale of the Town & Country and Owners' insurance policy covering Coleman are contracts to be considered in the analysis. Owners contends that the most significant relationship test points to Illinois law, because Coleman was incorporated in and doing business primarily in Illinois; the Town & Country was principally garaged, operated, and registered in Illinois; the agreement to sell the Town & Country was negotiated in Illinois; a contract was formed when the offer was accepted in Illinois; possession of the Town & Country and relevant documents was transferred in Illinois; and Owners' insurance policy covering Coleman was issued in Illinois.

11

Owners further argues that an agreement for sale of the Town & Country was reached between Ms. Hassen acting on behalf of Mr. Jacobs, and Coleman; and that the parties intended to transfer ownership of the Town & Country from Coleman to Mr. Jacobs when Ms. Hassen took possession of the Town & Country and relevant documents and drove it off of Coleman's lot.

AMCO disagrees with Owners' contention that Illinois law applies because it denies that a contract was formed in Illinois or elsewhere. AMCO states that under the "strict title" standards of Iowa or Missouri, Owners could not possibly prevail, but AMCO assumes for the sake of argument that Illinois law applies.

AMCO argues that it owed no duty to defend and indemnify Ms. Hassen under Mr. Jacobs' insurance policy because Mr. Jacobs never became owner of the Town & Country. AMCO maintains that Mr. Jacobs did not intend to purchase the Town & Country without having the opportunity to personally inspect it, an opportunity he never received because of the accident. Additonally, AMCO points to the facts that the Town & Country was never delivered to Mr. Jacobs, that Coleman filed an insurance claim for the Town & Country, and that proceeds from the sale of the Grand Caravan went to a creditor of Coleman.

**Summary Judgment Standard**

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

12

movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. Sokol & Assocs., Inc. v. Techsonic Indus., Inc., 495 F.3d 605, 610 (8th Cir. 2007).

**Choice of Law**

Federal district courts sitting in diversity apply the choice of law rules of the state in which they sit, Whirlpool Corp. v. Ritter, 929 F.2d. 1318, 1320 (8th Cir. 1991), and are "bound by decisions of the highest state court when interpreting state law." Beckon, Inc. v. AMCO Ins. Co., ___ F.3d ___, No. 09-2460, 2010 WL 3168627, at *6 (8th Cir. Aug. 12, 2010) (citation omitted). "If the [state supreme court] has not spoken on an issue, the federal court must determine what decision the state court would make if faced with the same facts and issue. The federal court should consider relevant state court decisions, analogous decisions, considered dicta, and any other reliable data." Myers v. Lutsen Mountains Corp., 587 F.3d 891, 896 (8th Cir. 2009) (citation omitted).

Under Missouri law, choice-of-law questions are generally governed by the Restatement (Second) of Conflict of Laws. Adams v. One Park Place Investors, LLC, ___ S.W.3d ___, No. WD 71652, 2010 WL 2570574, at *2 (Mo. Ct. App. June 29, 2010). When confronted with a conflict of laws, a court "'must determine at the outset whether the problem presented to it for solution relates to torts, contracts, property, or some other field . . . in order to . . . know which choice of law rule to apply to the case.'"

13

Farmers Exch. Bank v. Metro Contracting Servs., Inc., 107 S.W.3d 381, 390-91 (Mo. Ct. App. 2003) (quoting 16 Am. Jur. 2d Conflict of Laws § 3 (1998)).

Here, the Court believes that Missouri courts would conclude that the correct choice of law rule is provided by the Restatement (Second) of Conflict of Laws § 244. See Ellsworth v. Worthey, 612 S.W.2d 396, 399 (Mo. Ct. App. 1981). Section 244 states:

> (1) The validity and effect of a conveyance of an interest in a chattel as between the parties to the conveyance are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties, the chattel and the conveyance under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties, greater weight will usually be given to the location of the chattel, or group of chattels, at the time of the conveyance than to any other contact in determining the state of the applicable law.

The principles stated in § 6 are: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

The Court concludes that Illinois has the most significant relationship to the instant case. None of the principles enumerated in section 6 urge the application of Iowa[6] or Missouri[7] law strongly enough, if at all, to override the "greater weight" given to the location of the chattel at the time of the conveyance. The Town & Country, title certificate, and other related documents were physically conveyed from Coleman to Ms. Hassen in Illinois. Thus, Illinois law should determine the legal effect of that conveyance.

**Ownership of the Town & Country under Illinois Law**

Illinois statutory law requires that "[i]f an owner transfers his interest in a vehicle . . . at the time of the delivery of the vehicle he shall execute to the transferee an assignment and warrantee of title in the space provided on the certificate of title . . . and cause the certificate and assignment to be mailed or delivered to the transferee." 625 Ill. Comp. Stat. § 5/3-112. The statute further provides that transfer is not effective until the provisions of this section have been complied with. Id.

---

[6] The Court believes that the same result explained below would be reached under Iowa law.

[7] Missouri's only relationship to the case is that it is where the tort that set in motion the ownership dispute occurred. As the underlying wrongful death suit has been settled with regard to the parties involved here, the Court does not believe this can properly be classified as a tort conflict. Furthermore, the Missouri Supreme Court long ago rejected the "inflexible lex loci delicti rule" in favor of the Restatement's most significant relationship test. Kennedy v. Dixon, 439 S.W.2d 173, 184 (Mo. 1969).

However, Illinois courts have largely disregarded the statutory language in favor of determining ownership based on the intent of the parties, and allows for ownership without transfer of title. "'[A]lthough the Illinois Vehicle Code requires a transfer of certificate of title to effectuate the sale of a vehicle, it is not necessarily determinative of the passage of ownership. It is the intent of the parties involved, and not such statutory prerequisites which determines ownership.'" Libertyville Toyota v. U.S. Bank, 864 N.E.2d 850, 854 (Ill. App. Ct. 2007) (quoting Dan Pilson Auto Ctr. v. DeMarco, 509 N.E.2d 159, 161 (Ill. App. Ct. 1987)). "Since ownership is determined as of the time of the collision, the intent of the parties must be judged at the time of the collision." Sheary v. State Farm Mut. Auto. Ins. Co., 566 N.E.2d 794, 795 (Ill. App. Ct. 1991) (citation omitted). While the words and acts of the parties subsequent to the collision may be relevant, they may be so only to the extent that they reflect the parties' intent concerning the vehicle's ownership up to the time of the collision. See Country Mut. Ins. Co. v. Aetna Life & Cas. Ins. Co., 387 N.E.2d 1037, 1039 (Ill. App. Ct. 1979) (explaining that in a dispute over who insured a vehicle at the time of an accident, misrepresentations by an insurance agent after the accident "do not directly effect whether the auto changed hands" because "the key as to whether the transfer [of ownership] occurred on [the date of the accident] is what happened on or before [the date of the accident]").

Here, the Court concludes that, viewing the evidence in the light most favorable to each non-moving party, genuine issues of material fact on the matter of intent remain in dispute, which issues the Court believes are best determined at the bench trial.

16

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff/Counterclaim Defendant's motion for summary judgment is **DENIED**. [Doc. #23.]

**IT IS FURTHER ORDERED** that Defendant/Counterclaim Plaintiff's motion for summary judgment is **DENIED**. [Doc. #21.]

**IT IS FURTHER ORDERED** that the Court shall hold a final pretrial conference on **Thursday, November 4, 2010 at 12:30 p.m.** in Chambers (12 South).

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of August, 2010.