# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | |
|---|---|
| OWNERS INSURANCE COMPANY, )<br>)<br>Plaintiff/Counterclaim Defendant, )<br>)<br>v. )<br>)<br>AMCO INSURANCE COMPANY, )<br>)<br>Defendant/Counterclaim Plaintiff. ) | Case No. 2:09CV00016 AGF |

## MEMORANDUM OPINION

A bench trial was held on this diversity case on November 8, 2010. Both parties are motor vehicle liability insurance providers. They each seek a declaratory judgment regarding their obligations following a motor vehicle accident that led to the filing and settlement of a wrongful death suit based on the negligence of the driver of a certain vehicle. The parties dispute who owned this vehicle at the time of the accident, and thus, which insurance company was liable for the settlement amount.

Based on the testimony, the deposition of James Jacobs, and other evidence, and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law, based upon which judgment shall be entered in favor of Plaintiff/Counterclaim Defendant Owners Insurance Company ("Owners") and against Defendant/Counterclaim Plaintiff AMCO Insurance Company ("AMCO").

# FINDINGS OF FACT

Owners was the liability insurance provider of Coleman & Jansen Enterprise, Inc. d/b/a Neal Coleman Auto Sales ("Coleman"). The Coleman dealership was located in Quincy, Illinois, and owned by John Harvey. Owners issued a Garage Liability Policy with Coleman as the named insured and with effective coverage dates of December 31, 2006, through December 31, 2007. Under the policy, Owners agreed to pay all amounts that the insured, or anyone using a covered vehicle with permission of the insured, became obligated to pay as legal damages because of bodily injury or death resulting therefrom. Vehicles covered by the policy included all those owned by the insured, excluding those transferred to another pursuant to an agreement of sale. (Doc. #24-10.)

AMCO was the liability insurance provider of Mr. Jacobs, d/b/a Jim's Auto Sales ("Mr. Jacobs"). Mr. Jacobs' auto dealership was located in Bloomfield, Iowa. AMCO issued a Garage Liability Policy to Mr. Jacobs with effective coverage dates of April 15, 2007, through April 15, 2008. This policy provided that AMCO would pay all amounts that the insured, or anyone using a covered vehicle with permission of the insured, became obligated to pay as legal damages because of bodily injury or death caused by an accident resulting from garage operations. Vehicles covered by the policy included all those owned by the insured, including those acquired after the policy began, subject to some exclusions not relevant here.

Janet Hassen,[1] who was a self-employed "auto broker/car buyer," heard that Coleman was going out of business and liquidating its inventory of vehicles. Ms. Hassen acquired a list of Coleman's inventory and faxed it to Mr. Jacobs. Mr. Jacobs indicated an interest in purchasing two vehicles: a 2003 Chrysler Town & Country, and a 2005 Dodge Grand Caravan.

Ms. Hassen had been acquainted with Mr. Jacobs for five to six years prior to the transaction at issue. She had inspected and bid on vehicles at auction for him approximately 10 to 20 times. She had also negotiated the purchase of vehicles from other dealers for him approximately four times before, and had also delivered at least one of those vehicles. With regard to the dealer purchases, she would inspect the car, test drive it, discuss the car with Mr. Jacobs, and obtain authority to negotiate a price. The selling dealer would complete the paperwork, based on the information she provided, and Mr. Jacobs would advise whether he would pick up the car or have her deliver it to him. He would pay Ms. Hassen a "broker's fee" of $100 per vehicle, reimburse her for expenses incurred during delivery (such as fuel), and, if she delivered the car, give her a check for the purchase price, which she would deliver to the seller. This was how Ms. Hassen planned to carry out the purchase and delivery of the Town & Country and Grand Caravan.

---

[1] Ms. Hassen is referred to in some documents as "Janet Gower" or "Janet Grower."

On the occasion in question, Mr. Jacobs spoke to Ms. Hassen by telephone and she told him that the two vehicles he was interested in appeared to be in good shape. He told her the price he would be willing to pay for them and authorized her to negotiate the purchase of the vehicles on his behalf. Ms. Hassen conveyed the prices Mr. Jacobs was willing to pay to Mr. Harvey, who accepted them, and on Thursday, September 27, 2007, Ms. Hassen went to Coleman to pick up the two vehicles. She was given the Town & Country's title, bill of sale, odometer statement, tax form, and warranty sticker. The title, bill of sale, odometer statement, and tax form each named "Neal Coleman Auto Sales" as the seller/transferor and "Jim's Auto Sales" as the buyer/transferee. Both the bill of sale and tax form indicated a purchase price of $11,000. The documents, except the bill of sale, were signed by Coleman's title clerk. The Court credits Mr. Harvey's testimony that the absence of a signature by a Coleman agent on the bill of sale was due to an oversight. Ms. Hassen received similar paperwork for the Grand Caravan. Mr. Harvey considered the vehicles sold at this time.

Mr. Jacobs requested that Ms. Hassen deliver the two vehicles to him in Iowa, approximately 105 miles away. Because it was too late for her to make the trip that day, she said that she would deliver the vehicles the next day. Ms. Hassen and another driver took possession of the two vehicles and drove them to West Quincy, Missouri. Coleman's dealer plates were removed from the two vehicles before they were driven off Coleman's lot. Neither Ms. Hassen nor Mr. Harvey recalled what license plates, if any, were put on the vehicles at that time. Ms. Hassen stored the two vehicles overnight at West Quincy

Auto Auction, a property owned by Lackey Auto, Inc. ("Lackey Auto"). Lackey Auto was owned by Ms. Hassen's boyfriend at the time, Virgil Lackey.

After she arrived at West Quincy, Ms. Hassen put dealer plates belonging to Lackey Auto onto the two vehicles. She had used Lackey Auto's plates before in similar situations. On the morning of September 28, 2007, Ms. Hassen left West Quincy driving the Town & Country to deliver it to Mr. Jacobs in Iowa, with another driver accompanying her in the Grand Caravan. Not far from West Quincy, while heading north on a Missouri highway, Ms. Hassen struck the rear of a car driven by Floyd Bowles, who died as a result.

After the accident, Ms. Hassen informed Mr. Jacobs of what had transpired, and told him that she was not able to continue on with the other car. He told her to take care of herself, and said he would get the other car the following Wednesday at the West Quincy Auto Auction. Both the Town & Country and the Grand Caravan were taken back to West Quincy and stored on Mr. Lackey's property. Ms. Hassen met Mr. Jacobs the following Wednesday and tried to give him the title documents. He refused to take the documents, and from what he said, she understood that he had been advised not to take possession, on his insurance agent's recommendation.

At some point, the Grand Caravan was sold at the West Quincy Auto Auction by Mr. Lackey. Mr. Jacobs was present at the auction when the sale took place. The Grand Caravan had "Jim's Auto" in the window where the seller's name is typically displayed. The proceeds from the sale went to a bank to satisfy a debt owed by Coleman.

5

Mr. Harvey was advised that Mr. Jacobs was refusing to pay for the Town & Country, but Coleman's bank was demanding payment on its loan. Mr. Harvey therefore submitted a claim to Owners for the collision damage to the Town & Country. On November 6, 2007, Owners denied this claim on the basis that the vehicle bore Lackey Auto's dealer plates at the time of the accident.

On July 18, 2008, Jerald Bowles, Floyd Bowles's brother, filed a petition in Missouri state court against Ms. Hassen, Mr. Jacobs, Coleman, and Lackey Auto for the wrongful death of Floyd Bowles (the "Bowles Suit"). The Bowles Suit alleged that Ms. Hassen's negligence caused the accident that led to the death of Floyd Bowles, and that the other named defendants were liable under a respondeat superior theory as employers or principals of Ms. Hassen at the time of the accident.

In the Bowles Suit, Mr. Jacobs, Coleman, and Lackey Auto filed separate motions for summary judgment on the ground that Ms. Hassen was not their respective employee or agent at the time of the accident. Ms. Hassen hired her own attorney and demanded that Owners and AMCO defend and indemnify her in the Bowles Suit. Jerald Bowles made a settlement demand of $500,000 on Ms. Hassen, Owners, and AMCO. Ms. Hassen's attorney forwarded this demand to Owners and AMCO, again demanding defense and indemnification, and threatening to enter into an agreement under Missouri Revised Statute § 537.065[2] if the demands were not met. Owners and AMCO negotiated

---

[2] This statute provides in relevant part as follows:

a settlement in the amount of $250,000, with each insurer paying half, for all claims against Ms. Hassen, Mr. Jacobs, and Coleman. The settlement dismissed the claims against Mr. Jacobs and Coleman before their motions for summary judgment were decided. Owners and AMCO each reserved the right to litigate the coverage issue as to Ms. Hassen and recover its half of the settlement payment.

On April 20, 2009, Owners filed this action for declaratory judgment and equitable contribution against AMCO, alleging that Coleman was not the owner of the Town & Country at the time of the accident, and thus Owners owed no duty to defend and indemnify Ms. Hassen. On June 15, 2009, AMCO filed an answer and counterclaim seeking a declaration that Owners was obligated to cover Ms. Hassen at the time of the accident. Each party seeks reimbursement from the other of the $125,000 it contributed to the Bowles settlement.

## **CONCLUSIONS OF LAW**

The resolution of this case primarily turns on the question of whether Coleman or Mr. Jacobs owned the Town & Country at the time of the accident. If Mr. Jacobs owned the vehicle, AMCO's liability policy would cover the vehicle unless an exception to coverage applied. On the other hand, if Coleman owned the vehicle, Owners' liability

---

> Any person having an unliquidated claim for damages against a tort-feasor . . . may enter into a contract with such tort-feasor . . . whereby . . . the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person . . . will levy execution, by garnishment or as otherwise provided by law, except against . . . any insurer which insures the legal liability of the tort-feasor for such damage . . . .

policy would cover the vehicle barring an applicable exception. The Court first must decide which state's law is to be applied to determine ownership.

The three states with a relationship to the dispute are Illinois, Iowa, and Missouri. Missouri is a "strict title state," meaning that "'assignment of the certificate of title in the manner provided by statute is the exclusive and only method of transferring title to a motor vehicle.' . . . '[T]here are no exceptions to conform to intentions.'" Bolt v. Giordano, 310 S.W.3d 237, 244 (Mo. Ct. App. 2010) (quoting Jackson v. Cannon, 147 S.W.3d 168, 172 (Mo. App. Ct. 2004); Shivers v. Carr, 219 S.W.3d 301, 304 (Mo. Ct. App. 2007)). If Missouri law is applied, Coleman owned the Town & Country at the time of the accident because it is undisputed that title was not formally transferred to Mr. Jacobs.

Iowa uses a strict title standard in most situations, see Iowa Code § 321.45(2), but excuses the title holder from civil liability arising from "negligent operation of the motor vehicle by another" if he "has made a bona fide sale or transfer" and "delivered possession of the motor vehicle to the purchaser or transferee." Iowa Code § 321.493(3); see also W. States Ins. Co. v. Continental Ins. Co., 602 N.W.2d 360, 362 (Iowa 1999) ("[I]f an owner of a car sells and delivers it to a buyer, the buyer has a collision with a third person before the title certificate is transferred, and the third person sues the seller, the seller has a defense in that he is not in fact the owner.").

Under Illinois law, transfer of title "is not necessarily determinative of the passage of ownership. It is the intent of the parties involved, and not such statutory

prerequisites which determines ownership.'" Libertyville Toyota v. U.S. Bank, 864 N.E.2d 850, 854 (Ill. App. Ct. 2007) (quoting Dan Pilson Auto Ctr. v. DeMarco, 509 N.E.2d 159, 161 (Ill. App. Ct. 1987)). Thus, if Iowa or Illinois law is applied, it would have to be determined whether there was a "bona fide sale" and delivery of possession, or whether the "intent of the parties" demonstrates that ownership passed to Jacobs.

Federal district courts sitting in diversity apply the choice of law rules of the state in which they sit, Whirlpool Corp. v. Ritter, 929 F.2d. 1318, 1320 (8th Cir. 1991), and are "bound by decisions of the highest state court when interpreting state law." Beckon, Inc. v. AMCO Ins. Co., 616 F.3d 812, 819 (8th Cir. 2010) (citation omitted). "If the [state supreme court] has not spoken on an issue, the federal court must determine what decision the state court would make if faced with the same facts and issue. The federal court should consider relevant state court decisions, analogous decisions, considered dicta, and any other reliable data." Myers v. Lutsen Mountains Corp., 587 F.3d 891, 896 (8th Cir. 2009) (citation omitted).

Under Missouri law, choice-of-law questions are generally governed by the Restatement (Second) of Conflict of Laws. Adams v. One Park Place Investors, LLC, 315 S.W.3d 742, 745 (Mo. Ct. App. 2010). When confronted with a conflict of laws, a court "'must determine at the outset whether the problem presented to it for solution relates to torts, contracts, property, or some other field . . . in order to . . . . know which choice of law rule to apply to the case.'" Farmers Exch. Bank v. Metro Contracting

Servs., Inc., 107 S.W.3d 381, 390-91 (Mo. Ct. App. 2003) (quoting 16 Am. Jur. 2d Conflict of Laws § 3 (1998)).

Here, the Court believes that a Missouri court would conclude that the correct choice of law rule is provided by the Restatement (Second) of Conflict of Laws § 244. See Ellsworth v. Worthey, 612 S.W.2d 396, 399 (Mo. Ct. App. 1981). Section 244 states:

> (1) The validity and effect of a conveyance of an interest in a chattel as between the parties to the conveyance are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties, the chattel and the conveyance under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties, greater weight will usually be given to the location of the chattel, or group of chattels, at the time of the conveyance than to any other contact in determining the state of the applicable law.

Restatement (Second) of Conflict of Laws § 244. The principles stated in § 6 are: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

The Court concludes that Illinois has the most significant relationship to the

instant case. None of the principles enumerated in section 6 urge the application of Iowa[3] or Missouri[4] law strongly enough, if at all, to override the "greater weight" given to the location of the chattel at the time of the conveyance. The Town & Country title certificate and other related documents were physically conveyed from Coleman to Ms. Hassen in Illinois. Thus, Illinois law should determine the legal effect of that conveyance.

Illinois statutory law requires that "[i]f an owner transfers his interest in a vehicle . . . at the time of the delivery of the vehicle he shall execute to the transferee an assignment and warranty of title in the space provided on the certificate of title . . . and cause the certificate and assignment to be mailed or delivered to the transferee." 625 Ill. Comp. Stat. § 5/3-112 (2002). The statute further provides that transfer is not effective until the provisions of this section have been complied with. Id.

However, Illinois courts have largely disregarded the statutory language in favor of determining ownership based on the intent of the parties, and allows for ownership without transfer of title. "'[A]lthough the Illinois Vehicle Code requires a transfer of

---

[3] The Court believes that the same result explained below would be reached under Iowa law.

[4] Missouri's only relationship to the case is that it is where the tort that set in motion the ownership dispute occurred. As the underlying wrongful death suit has been settled with regard to the parties involved here, the Court does not believe this can properly be classified as a tort conflict. Furthermore, the Missouri Supreme Court long ago rejected the "inflexible lex loci delicti rule" in favor of the Restatement's most significant relationship test. Kennedy v. Dixon, 439 S.W.2d 173, 184 (Mo. 1969).

11

certificate of title to effectuate the sale of a vehicle, it is not necessarily determinative of the passage of ownership. It is the intent of the parties involved, and not such statutory prerequisites which determines ownership.'" Libertyville Toyota, 864 N.E.2d at 854 (quoting Dan Pilson Auto Ctr., 509 N.E.2d at 161). "Since ownership is determined as of the time of the collision, the intent of the parties must be judged at the time of the collision." Sheary v. State Farm Mut. Auto. Ins. Co., 566 N.E.2d 794, 795 (Ill. App. Ct. 1991) (citation omitted). While the words and acts of the parties subsequent to the collision may be relevant, they may be so only to the extent that they reflect the parties' intent concerning the vehicle's ownership up to the time of the collision. Country Mut. Ins. Co. v. Aetna Life & Cas. Ins. Co., 387 N.E.2d 1037, 1039 (Ill. App. Ct. 1979) (explaining that in a dispute over who insured a vehicle at the time of an accident, misrepresentations by an insurance agent after the accident "do not directly effect whether the auto changed hands" because "the key as to whether the transfer [of ownership] occurred on [the date of the accident] is what happened on or before [the date of the accident]").

Here, the Court concludes that the parties intended to transfer ownership prior to the accident. There is no question that Coleman intended to transfer ownership by the time the vehicles left Coleman's lot. As found above, Mr. Harvey considered the Town & Country sold once a purchase price had been agreed upon on September 25, 2007. Ms. Hassen was thereafter given possession of the vehicle as well as its title, bill of sale, odometer statement, tax form, and warranty sticker. The title, bill of sale, odometer

12

statement, and tax form each named Coleman as the seller/transferor and Mr. Jacobs as the buyer/transferee. The documents, other than the bill of sale, were signed by Coleman's title clerk.

The Court finds that Mr. Jacobs also intended a transfer of ownership. The evidence is undisputed that Ms. Hassen made an offer to Coleman for the Town & Country based on the price that Mr. Jacobs was willing to pay, that Coleman agreed to that price, that Mr. Jacobs was informed that his offered price had been accepted, and that Mr. Jacobs had no intention to negotiate the price any further. There is also no dispute that Mr. Jacobs directed her to deliver the vehicle to him, that Ms. Hassen was en route to deliver the Town & Country to Mr. Jacobs when the accident occurred, and that Mr. Jacobs intended to sign the title of and pay for the Town & Country once it was delivered to him so long as it was "right," meaning, that it was as Ms. Hassen represented. Mr. Jacobs never signed the title or paid for the Town & Country, only because it had been in the accident and he did not want to be responsible for any consequences of ownership of the vehicle at the time of the accident.

Though AMCO argued at trial that Mr. Jacobs did not intend to purchase the vehicles until after he inspected them, the Court is not persuaded that the vehicles were transported to him simply for his inspection. Mr. Jacobs' testimony in this regard is not credible. Nor does it make sense that Ms. Hassen was delivering the vehicles to Mr.

Jacobs, simply for his inspection and possible purchase.[5] The paperwork was completed for a transfer, not a conditional sale, and Mr. Harvey would not have completed the paperwork in this manner for anything but an unconditional sale. Further, Coleman was going out of business and liquidating its inventory, which also makes a conditional transaction implausible. The Court credits the testimony of Mr. Harvey and Ms. Hassen over that of Mr. Jacobs, and finds, as a factual matter, that Mr. Jacobs intended to purchase the Town & Country when it was conveyed to Ms. Hassen.

Neither the fact that Mr. Harvey eventually filed an insurance claim for the collision damage to the vehicle, nor that proceeds from the Grand Caravan's eventual sale went to Coleman's benefit mitigates against this conclusion, as Mr. Harvey filed his insurance claim only after he was advised that he was not going to receive payment from Mr. Jacobs. These events do not reflect the intent of the parties at the time of the accident, but rather what they chose to do in light of the changed circumstances that the accident brought about. See Country Mut. Ins. Co., 387 N.E.2d at 1039 (stating that events that directly effect ownership of a vehicle at the time of an accident are those that occur before, not after, the accident). Mr. Jacobs' failure to demonstrate indicia of ownership was motivated by his desire not to be involved in ramifications of the accident, and therefor cannot disprove his intent to purchase the Town & Country prior to the time that the accident occurred.

---

[5] Ms. Hassen described this type of transaction as a "show and tell."

In sum, this Court believes that Missouri's highest court would conclude that Illinois law applies to the question of ownership of the Town & Country, and that under Illinois law, Mr. Jacobs was the owner of the Town & Country at the time of the accident. As Mr. Jacobs was the owner of the Town & Country, only AMCO's insurance policy could have provided coverage. AMCO's garage liability policy issued to Mr. Jacobs extends coverage to anyone who used an auto "own[ed], hire[d], or borrow[ed]" by the named insured with the permission of the named insured. Mr. Jacobs knew that Ms. Hassen would be delivering the Town & Country to him in Iowa. Thus, at the time of the accident, Ms. Hassen was operating a vehicle owned by Mr. Jacobs, with his permission, and AMCO is liable for the damages paid due to the Bowles suit.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Judgment is entered on behalf of Plaintiff/Counterclaim Defendant and against Defendant/Counterclaim Plaintiff.

A separate Judgment shall accompany this Memorandum Opinion.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 10th day of February, 2011.